KITCHENS, Justice,
specially concurring:
¶ 36. While concurring with the well-reasoned majority opinion authored by Justice Lamar, I write separately to underscore certain of the excellent points made by her, and to make additional observations which I deem pertinent.
¶ 37. The late Louis St. Martin’s admittedly satisfied clients, James R. Forbes and his spouse, Lisa Forbes, seek to have their cake and eat it too by disgorging from St. Martin’s estate the attorney fee which the attorney had earned and to which the Forbeses had contractually agreed. In the first instance, the Forbes-es attempt to repudiate the contract of employment signed by Lisa Forbes in Mobile, Alabama, on August 11, 1998, shortly after the accident in which James Forbes had been injured. Interestingly, but erroneously, Lisa’s entering into this contract is characterized as having been undertaken on behalf of James; and, in a very real sense, it was undoubtedly to James’s advantage for competent attorneys to begin investigating and preparing his case immediately, rather than commencing that process after James himself could sign a contract, which would not occur until months later. In truth, however, James is not mentioned in the Mobile contract. Rather, it is a contract between St. Martin’s law firm and Lisa Forbes only. The accident in which James had been injured is described in that agreement as “explosion at Texaco Gas Station in Biloxi.” As James Forbes’s spouse, Lisa was well within her rights to employ the attorney(s) of her choice to represent her in the pursuit of her own claim for loss of consortium, pursuant to Mississippi Code Section 93-3-1. With James in a coma and thus completely incapacitated, Lisa’s legitimate entry into a contract of employment with an attorney who had been recommended and sent to *1139 her by members of her own family served the important purpose of promptly getting a lawyer on the job of gathering and preserving vital evidence that likely would have dissipated rapidly.
¶ 38. Some ten months later, after James’s condition had greatly improved and under far less exigent circumstances, both he and Lisa signed a second contract of employment with St. Martin’s firm. This occurred at St. Martin’s law office in Terrebonne Parish, Louisiana, on June 10, 1999. As can be gleaned from a reading of the majority opinion, both contracts with the St. Martin firm appear to have been entered into by informed and willing parties, and all of the attendant circumstances were above board and without any hint of impropriety on the part of anyone. Indeed, nothing about St. Martin’s conduct strikes me as unusual or inappropriate.
¶ 39. St. Martin was formally hired in Alabama and in Louisiana to represent two Mississippi residents who believed they were entitled to compensation for a serious injury that had befallen one of them— James — in Mississippi. Although I greatly respect the opinion of my valued colleague, Justice Coleman, that the engagement of St. Martin by the Forbeses was illegal, I could not disagree more. At the time the Forbeses retained St. Martin’s services, nothing in the jurisprudence of Mississippi prohibited its citizens from employing out-of-state attorneys from other U.S. jurisdictions to handle legal matters for them within this state, provided those attorneys jumped through the hoops of associating Mississippi-licensed counsel-which St. Martin promptly did — and, when appropriate, acquired pro hac vice status. In 1998, when the Forbeses first hired St. Martin, Mississippi Rule of Appellate Procedure 46 did not contain a definition of what an “appearance” was in the context of the requirement of pro hac vice admission.[33] Clearly, St. Martin had good reason to understand that his role in handling the Forbeses’ claims could legally be fulfilled by associating Mississippi counsel and acting in an advisory capacity without participating in Mississippi court proceedings or depositions.[34] Indeed, as observed by the majority, at the time he participated in the litigation, he could not have known that he could be at risk in making an “appearance” by the placement of his name on a pleading [35] or by simply showing up at a deposition, as this Court had not yet decided what “appearance” means in the pro hac vice context. See In re Williamson, 838 So.2d 226, 235 (¶22) (Miss.2002). Accordingly, I do not see how the contracts between the Forbeses and St. Martin could have been illegal, as there was no law prohibiting the promises made by St. Martin when they were created. That said, I *1140 do not disagree with the majority’s conclusions respecting certain invalid provisions in both contracts.
¶ 40. Additionally, with abiding respect for Justice Coleman and his interpretation of the contracts to the effect that St. Martin contractually obligated himself to be the only lawyer on Earth who would work on the Forbeses’ case, a reading of the two contracts in their entirety refutes this notion. The language in the opening paragraph of both documents makes it abundantly clear that the word attorney does not refer to one lawyer: “... [client] hereby employ[s] and retainfs] St. Martin, Ma-honey & Associates (A Professional Law Corporation), (hereinafter referred to as ‘attorney’) to handle any and all claims.... ” Without doubt, this language informs the reader that not just one lawyer, but a firm of lawyers is being hired by the clients.
¶ 41. The clause in the contracts which seems to stand between Justice Coleman and the realities of the agreement between these parties is, “My (Our) attorney is to have the exclusive handling of this claim .... ” (Emphasis added.) The meaning of this contractual provision turns on one’s understanding of the word handling in the context of the work performed by plaintiffs’ attorneys and, as I have come to understand it, means attending to and overseeing the prosecution of the claim. It does not preclude the involvement of attorneys in addition to Louis St. Martin in the prosecution of the Forbeses’ claims. Indeed, the contracts were between the claimants and the law firm of which Louis St. Martin was a member, not just with St. Martin as an individual lawyer. No one could read the first paragraph of the contracts and glean any expectation that Louis St. Martin would be the only lawyer working on behalf of the Forbeses. The purpose of the provision that “My (Our) attorney is to have the exclusive handling of this claim ...” is to prevent the clients from hiring a different lawyer or set of lawyers in addition to the St. Martin firm and the Mississippi-licensed lawyers to be associated by that firm. This clause in nowise precludes St. Martin and his firm from enlisting whatever attorneys outside his law firm they might deem necessary to the proper handling of the case.
¶ 42. Finally, in light of the state of extreme vulnerability of contingency-fee attorneys who are reminded by today’s decision that they are prohibited from including so-called “anti-settlement” and “anti-termination” clauses in their employment contracts, Mississippi practitioners are cautioned that it behooves them to keep accurate time records, even in cases in which they hope to earn a contingency fee. Such records may become of vital importance in an attorney’s attempt to be paid on a quantum meruit basis if a client settles without his attorney’s knowledge or if a client terminates his lawyer’s employment before the claim has been concluded by settlement or judgment. And, of course, it always is essential that the attorney keep detailed records of out-of-pocket expenses in furtherance of the client’s claim. Obviously, this is necessary for the attorney to obtain reimbursement from the client at the end of a contingency-fee case (and cases with different fee arrangements as well), and can take on great importance to a discharged attorney who wishes to impress a lien upon a former client’s claim and/or monies in the hands of alleged tort feasors and/or their insurance carriers.
¶ 43. A word to the wise is sufficient.
LAMAR AND KING, JJ., JOIN THIS OPINION. WALLER, C.J., JOINS THIS OPINION IN PART.

. I must also note the confusion that surely results from this Court's placement of the rules to obtain pro hac vice admission to trial courts in its Rules of Appellate Procedure.

. In Louisiana, at the time the Forbeses retained St. Martin's services, an out-of-state attorney who wished to be involved in a case in Louisiana was required only to associate "with some attorney duly licensed to practice law by the supreme court of [Louisiana].” La.Rev.Stat. Ann. § 37:214. The Supreme Court of Louisiana later changed that rule to require stricter pro hac vice admission standards. See La. Sup.Ct. R. XVII § 13.

.Prior to this Court's finding fault with this practice, as explained by the majority, including associated out-of-state attorneys on pleadings was often done, and was thought by many reputable attorneys to be a good and courteous practice in terms of disclosure to opposing counsel and to courts of all attorneys who would be involved in the litigation, even if that involvement would be nominal and/or would not entail court appearances by all listed counsel.